**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAMELA L. KERN, | : | |
|     **Plaintiff** | : | No. 1:22-cv-01128 |
| | : | |
|     v. | : | (Judge Kane) |
| | : | |
| DAS COMPANIES, INC., | : | |
|     **Defendant** | : | |

## MEMORANDUM

This case arises from allegations of retaliation and discrimination by Plaintiff Pamela L.

Kern ("Plaintiff") against her former employer Defendant DAS Companies, Inc. ("Defendant").

Plaintiff asserts that Defendant first fired and then retaliated against her in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and Pennsylvania

Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 951 et seq. Before the Court is Defendant's

motion for summary judgment. (Doc. No. 35.) For the reasons that follow, the Court will grant

Defendant's motion in its entirety.

## I.   BACKGROUND

### A.   Factual Background[1]

Defendant is a full-service marketing and global supply chain portfolio company which

designs, imports, and distributes "travel related products," such as truck and automobile supplies,

travel gear, and mobile electronics. (Doc. No. 36 ¶¶ 1–2.) In 2020, Defendant's President was

Michael Z. Abel ("Mr. Abel"), a fifty-six (56) year old man. (Id. ¶¶ 3–4.)[2] On February 27,

---

[1]  The following relevant facts of record are taken from Defendant's Concise Statement of
Material Facts (Doc. No. 36) and Plaintiff's Responsive Statement of Material Facts (Doc. No.
48) and are undisputed unless otherwise noted. Both statements contain specific citations to the
record at each numbered paragraph.

[2]  Plaintiff states that Mr. Abel was actually fifty-four (54) years old in the spring of 2020. (Doc.
No. 48 at 2.) Upon review of the record, it appears that Plaintiff is correct. In his deposition,

2020, Mr. Abel e-mailed department heads to announce that he would be reviewing and cutting

budgets, and likely dismissing personnel as well.  (<u>Id.</u> ¶ 5.)  In March of 2020, the coronavirus

pandemic shuttered the travel industry, decreasing demand for Defendant's products.  (<u>Id.</u> ¶ 6.)[3]

Accordingly, Mr. Abel initiated phased layoffs, trusting his department heads to decide whom to

layoff and consulting them during the process of trimming payroll.  (<u>Id.</u> ¶¶ 7–8.)

     In the spring of 2020, Charles White ("Mr. White") served as Defendant's Vice President

of Brands and Marketing.  (<u>Id.</u> ¶ 9.)  Defendant maintains that Mr. White was fifty-three (53)

years old in the spring of 2023, while Plaintiff cites Mr. White's deposition, wherein he states

that he was born in August 1967, which would make him fifty-two (52) in the spring of 2020.

(<u>Id.</u> ¶ 10; Doc. No. 48 ¶ 10.)  In considering whom to layoff, Mr. White considered "critical

business functions and roles that 'would have the least immediate financial impact on the

business.'"  (Doc. No. 36 ¶ 11.)  Plaintiff disputes this fact, claiming that: (1) Mr. White failed to

consult with Plaintiff's supervisor, Gina Bonafede ("Ms. Bonafede") about the implications of

laying Plaintiff off; (2) Mr. White failed to consult the proper figures, namely Tim Luce ("Mr.

Luce"), the Information Technology ("IT") Director, with whom Plaintiff was working on a

project; and (3) Mr. White did not actually consider roles and business functions during the

layoff process.  (Doc. No. 48 ¶ 11 (citing several depositions).)  During Phase One (1) layoffs,

Mr. White decided to layoff Plaintiff, Marketing Analysis Manager Christopher Vang ("Mr.

Vang"), and Customer Service Representative Danielle Crockett ("Ms. Crockett").  (<u>Id.</u> ¶ 12.)

---

Mr. Abel stated that he was born in 1965, and further noted that he was fifty-seven (57) years old
at the time of the deposition, which was taken in May of 2023.  (Doc. No. 37-1 at 5.)

[3]  Plaintiff denies this assertion in part, stating that the trucking industry, one of Defendant's
customers, continued to demand Defendant's products.  (Doc. No. 48 ¶ 7.)  Further, Plaintiff
maintains that Defendant "had reached the highest net operation income in company history" by
August of 2020.  (<u>Id.</u>)

During Phase Two (2) layoffs, Mr. White decided to layoff Director of Channel & Shopper Derek Lehman ("Mr. Lehman.") (Id.)  When the Phase One (1) layoffs were actually implemented, Defendant terminated Plaintiff, Mr. Vang, Ms. Crockett, as well as two other employees effective April 6, 2020.  (Id. ¶ 13.)

On April 3, 2020, Defendant's Vice President of Human Resources Wendy Stoviak ("Ms. Stoviak") emailed Plaintiff, informing her that Defendant would be laying her off effective April 6, 2020.  (Id. ¶ 14.)  As of April 3, 2020, Plaintiff had been a full-time salaried employee earning $50,458 annually.  (Id. ¶ 15.)  At the time she was laid off, Plaintiff had sixteen (16) coworkers in the Marketing Department, she was the third oldest employee, and the other two employees in the Phase One (1) layoffs were among the youngest employees working in the department.  (Id. ¶ 16.)[4]  Defendant maintains that, prior to the Phase One (1) layoff on April 6, 2020, the average age of Marketing Department employees was 43.19, although Plaintiff disputes the ages of multiple employees and asserts that the average age was actually 43.06.  (Id. ¶ 17; Doc. No. 48 ¶ 17.)  It is undisputed that the average age of employees in the Marketing Department after Phase One (1) layoffs was forty-four (44).  (Doc. No. 36 ¶ 18; Doc. No. 48 ¶ 18.)

On April 20, 2020, Defendant instituted Phase Two (2) layoffs, resulting in the termination of eleven (11) employees.  (Doc. No. 36 ¶ 19.)  Mr. Lehman was not terminated, because Mr. White took a leave of absence and Mr. Lehman and Ms. Bonafede assumed his duties.  (Id. ¶ 20.)  On May 8, 2020, Defendant instituted Phase Three (3) layoffs, terminating eighteen (18) employees.  (Id. ¶ 21.)  Defendant maintains that it hoped the layoffs would be temporary, and it continued to provide healthcare benefits to those individuals through May 31,

---

[4]  Defendant's Concise Statement of Material Facts contains a table with the aforementioned information.  See (Doc. No. 36 at 4).  Plaintiff disputes one job title noted in the table, as well as the ages of two employees.  See (Doc. No. 48 at 10).

2020.  (Id. ¶ 22.)  On May 28, 2020, Ms. Stoviak informed Plaintiff that Defendant would not be recalling her and accordingly her health benefits would end on May 31, 2020.  (Id. ¶ 23.)  Ms. Crockett was also not recalled.  (Id. ¶ 24.)  Defendant offered Mr. Vang an interview for another position, and after he rejected the interview, Defendant elected not to recall him as well.  (Id. ¶ 25.)  Ultimately, twelve (12) of the thirty-four (34) employees laid off during the spring of 2020 were never recalled.  (Id. ¶ 26.)

Ross Sachs ("Mr. Sachs") served as Defendant's Director of Marketing Communications from 2011 through 2016.  (Id. ¶ 27.)  While in that role, Mr. Sachs directly supervised Plaintiff. (Id. ¶ 28.)  Mr. Sachs created a spreadsheet to evaluate employee skillsets, whereby a score of 4.9 and under indicated that an employee was weak regarding that skill.  (Id. ¶ 29.)  Mr. Sachs awarded Plaintiff the following scores: 2.0 for communications, 3.0 for coachability, 2.0 for attitude, and 3.0 for learning.  (Id. ¶ 30.)  In the comments section, Mr. Sachs noted that Plaintiff had an "inconsistent" attitude while on the job and "prefers things done [her] way, otherwise things may not be done" according to established procedures, while also critiquing her overall professionalism.  (Id. ¶ 31.)  Defendant maintains that Plaintiff "intermittently exhibited negative and self-focused behavior during the time Mr. Sachs supervised her in the Marketing Department," (id. ¶ 32), while Plaintiff denies this assertion, citing Mr. Sachs' deposition in which he states that "some days [Plaintiff] was a peach, meaning good, great" to supervise (Doc. No. 48 ¶ 32).

After Mr. Sachs left the Marketing Department, Mr. Kevin Willi ("Mr. Willi") supervised Plaintiff.  (Doc. No. 36 ¶ 33.)  On June 10, 2015, Mr. Willi gave Plaintiff a verbal warning, highlighting her inconsistent performance, unprofessional communication methods, and describing her behavior as "not conducive to a professional, team oriented environment."  (Id. ¶

34.)  The parties dispute whether Plaintiff was placed on a "Performance Improvement Plan."

Defendant asserts that in June 2015, Mr. Willi placed Plaintiff on a Performance Improvement

Plan.  (Id. ¶ 35.)  Plaintiff denies this assertion, citing to her paper and electronic personnel file

and noting that there is no Performance Improvement Plan in said file, while also citing Ms.

Bonafede's deposition in which she stated that she had not observed a Performance Improvement

Plan when reviewing Plaintiff's personnel file.  (Doc. No. 48 ¶ 35.)  On July 2, 2018, Mr.

Lehman complained about Plaintiff to Mr. Willi and Ms. Bonafede, calling her a "toxic team

member" and concluding that although she is "a very capable team member, unfortunately she

does not play well with others.  She is negative, condescending, rude and miserable to work

with."  (Doc. No. 36 ¶ 36.)  On July 18, 2018, Mr. Willi gave Plaintiff a written warning for

"negative, condescending, rude, combative, and disruptive behavior," noting that Defendant had

addressed these issues with her on prior occasions.  (Id. ¶ 37.)  The parties agree that Plaintiff's

2018 performance evaluation noted that she "[n]eeds [i]mprovement," but Plaintiff argues that

only Mr. Willi, and not Ms. Bonafede, authored said evaluation.  (Id. ¶ 38; Doc. No. 48 ¶ 38.)

Mr. Willi eventually stopped working for Defendant sometime in 2018, and Plaintiff began

reporting directly to Ms. Bonafede.  (Doc. No. 36 ¶ 39.)

During 2019 and 2020, Ms. Bonafede worked as Defendant's Director of Marketing

Communications.  (Id. ¶ 40.)  On June 25, 2019, Ms. Bonafede informed Ms. Stoviak that two

Marketing Department employees complained about Plaintiff's behavior and attitude.  (Id. ¶ 41.)

Ms. Bonafede summarized Plaintiff's performance evaluations from 2012 to 2018 relating to

teamwork and communication, rating her as fully satisfactory overall, while noting that in the

area of teamwork, Plaintiff "[n]eeds improvement."  (Id. ¶¶ 42–43.)  Ms. Bonafede testified that

Plaintiff:

had a very negative attitude that traveled through the whole department.  People did not like interacting with [Plaintiff].  And in a lot of cases[,] they would rather do something themselves that was outside of their job scope than ask her to do it because they didn't, they didn't want to deal with the reaction that was inevitable when dealing with [Plaintiff].

(Id. ¶ 44.)

In 2017, Defendant hired Mr. Luce as Head of IT.  (Id. ¶ 45.)  In April of 2020, Mr. Luce was fifty-three (53) years old.  (Id. ¶ 46.)[5]  Mr. Luce testified that Plaintiff's attitude at work was problematic, and further explained that he told Ms. Bonafede she "needed the type of resources who would work together instead of creating a difficult working environment."  (Id. ¶ 47.)  Defendant maintains that Mr. Luce believed Plaintiff had engaged in secretive conduct during earlier projects, and this secretive behavior justified her termination.  (Id. ¶ 48.)  Plaintiff denies this assertion, stating that Mr. Luce failed to specify the projects during which she allegedly engaged in secretive behavior, and further noting that Mr. Luce once lauded Plaintiff's ability to explain workplace processes to others.  (Doc. No. 48 ¶ 48.)  Defendant further asserts that, prior to Plaintiff's layoff in 2020, Mr. Luce recommended her termination to Mr. White, Ms. Bonafede, and Human Resources ("HR").  (Doc. No. 36 ¶ 49.)

From August 20, 2015 through December 4, 2019, Plaintiff applied to fourteen (14) positions with Defendant.  (Id. ¶ 50.)  Defendant maintains that it did not hire Plaintiff for any of these positions because they "were not compatible with her prior work experience, or the positions were inconsistent with her poor employment record," (id. ¶ 51), while Plaintiff asserts that she had performed the duties described in the job postings, namely the eCommerce positions, and was never given explanations as to why Defendant chose not to hire her for these

---

[5]  Plaintiff denies this assertion, noting that because Mr. Luce was born in November 1967, he was fifty-two (52) in April of 2020.  (Doc. No. 48 ¶ 46.)

jobs (Doc. No. 48 ¶ 51).  Beginning on July 22, 2020, after she had been laid off, Plaintiff

applied for several positions posted by Defendant on CareerBuilder and Indeed.[6]  (Doc. No. 36 ¶

52.)  Defendant again maintains that it chose not to hire Plaintiff for any of these positions

because she did not meet the qualifications, her prior experience did not match the job

descriptions, and the positions required a minimum level of co-worker interaction for which

Plaintiff was not equipped.  (Id. ¶ 53.)[7]

On July 28, 2020, Defendant posted an open Content and Asset Coordinator position, and

Plaintiff and four others subsequently applied for said position.  (Id. ¶¶ 54–56.)  Defendant

maintains that Ms. Bonafede did not select Plaintiff to interview for this position because of her

"attitude and inability to work with others," (id. ¶ 57), while Plaintiff asserts that Ms. Bonafede

did not really believe that she was "toxic," and further claims that Ms. Bonafede's reasoning was

post hoc and inaccurate (Doc. No. 48 ¶ 57).  Defendant further maintains that Ms. Bonafede's

decision was driven in part by her feeling that Plaintiff "lacked the e-commerce skills required

for the Content and Asset Coordinator position," in addition to the fact that Ms. Bonafede had

found issues with Plaintiff's prior work with the company from years before.  (Doc. No. 36 ¶

58.)[8]  Defendant asserts that these issues included poor writing style and grammar, as well as

---

[6]  These are both websites which allow individuals to find and pursue employment opportunities.
See Adams v. Interarch, Inc., No. 06-cv-02638, 2008 WL 5377757 at *6 (D.N.J. Dec. 18, 2008)
(discussing the use of CareerBuilder); Gilbert v. Indeed, Inc., 513 F. Supp. 3d 374, 383
(S.D.N.Y. 2021) (explaining that Indeed is "a search engine for job listings that connect
prospective employees with employers").

[7]  Plaintiff concedes that Defendant chose not to hire her for any of the posted positions but
maintains that Plaintiff was qualified for several of the positions for which she applied.  (Doc.
No. 48 ¶ 53.)

[8]  Plaintiff's denial as to this contention includes a citation to Mr. Sachs' deposition in which he
stated that he felt Plaintiff was overqualified for the Content and Asset Coordinator position.

Plaintiff's omission of necessary information from data fields pertinent to the work product.  (Id. ¶ 59.)  Plaintiff maintains that Ms. Bonafede did not find issues with Plaintiff's work product because she gave Plaintiff positive evaluations.  (Doc. No. 48 ¶ 59.)

By August 11, 2020, Defendant removed the advertisement for the Content and Asset Coordinator position because it decided not to hire anyone.  (Doc. No. 36 ¶ 60.)[9]  On October 5, 2020, Ms. Bonafede needed assistance due to increased business, so Ms. Torres was assigned to Defendant by Staffing USA to help Ms. Bonafede on a part-time basis.  (Id. ¶ 61.)  Ms. Torres began working full-time hours on November 24, 2020, before being hired as the full-time Content and Asset Coordinator on December 6, 2021.  (Id. ¶¶ 62–63.)  Ms. Torres was forty (40) years old at the time Defendant hired her to work full-time.  (Id. ¶ 64.)

In late 2020, Plaintiff applied to be an E-Commerce Affiliate Marketing Manager with Fox Chapel, a publishing company, and subsequently interviewed for the position.  (Id. ¶¶ 65–66; Doc. No. 37-33 at 11.)  Fox Chapel thereafter "canceled" the position and never hired anyone to assume the role.  (Doc. No. 36 ¶ 67.)  On December 29, 2020, Plaintiff applied to work as a Print Production Assistant at Fox Chapel.  (Id. ¶ 68.)  Fox Chapel asked Plaintiff to provide a reference from a former direct supervisor and Plaintiff provided Fox Chapel with the contact information for Ms. Bonafede.  (Id. ¶¶ 69–70.)  Plaintiff did not notify Ms. Bonafede that she

---

(Doc. No. 48 ¶ 58 (citing Doc. No. 37-12 at 50–51).)  Plaintiff also maintains that any issues with her work from prior years could be attributed to others.  (Doc. No. 48 ¶ 58.)

[9]  Plaintiff concedes that Defendant removed the advertisement for the position but argues that: (1) Defendant hired Andrew DeBord ("Mr. DeBord") to work as E-Commerce Senior Coordinator, a position Plaintiff maintains is similar to the Content and Asset Coordinator position; (2) Defendant eventually filled the Content and Asset Coordinator position with Tracey Torres ("Ms. Torres"), after a period during which Ms. Torres worked part-time and performed many of the tasks formerly performed by Plaintiff; and (3) Defendant made Ms. Torres a full-time employee in December of 2021.  (Doc. No. 48 ¶ 60.)

provided her contact information to Fox Chapel.  (Id. ¶ 71.)  Aubrey Vonada ("Ms. Vonada"),

Fox Chapel's Human Resources and Payroll Manager, emailed Ms. Bonafede regarding the

reference.  (Id. ¶ 72.)  Ms. Bonafede sent this referral request to Julie Houseal ("Ms. Houseal"), a

member of Defendant's HR Department.  (Id. ¶ 73.)  Defendant's policy for referrals is "only to

verify dates of employment, wages, and title."  (Id. ¶ 74.)  Ms. Bonafede informed Fox Chapel

about Defendant's policy, and Ms. Vonada later confirmed that Defendant's response sounded

like a standard practice, affirming that this interaction with Ms. Bonafede did not influence her

perception of Plaintiff's application.  (Id. ¶¶ 75–76.)  None of Fox Chapel's hiring managers

commented negatively to Ms. Vonada about Defendant's response to Ms. Vonada's information

request.  (Id. ¶ 77.)  Fox Chapel eventually hired another candidate for the position.  (Id. ¶ 78.)

A few months later, the selected candidate resigned, and Fox Chapel reached out to Plaintiff to

gauge if she was still interested in the position for which she had previously interviewed.  (Id. ¶

79.)  On June 14, 2021, Fox Chapel hired Plaintiff.  (Id. ¶ 80.)

On September 28, 2020, Plaintiff's counsel mailed a letter to Defendant notifying it of

Plaintiff's potential litigation alleging age discrimination pursuant to the ADEA and PHRA.  (Id.

¶ 81.)  On October 5, 2020, Plaintiff filed a charge of discrimination with the Equal Employment

Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission

("PHRC").  (Id. ¶ 82.)  On April 12, 2021, Plaintiff filed an amended charge of discrimination

with both the EEOC and PHRC to include claims of retaliation.  (Id. ¶ 83.)

### B.    Procedural Background

On July 20, 2022, Plaintiff initiated the above captioned action against Defendant,

asserting four claims.  (Doc. No. 1.)  Plaintiff avers that she was discriminatorily terminated

pursuant to the ADEA and PHRA (Counts One and Three) and retaliated against in violation of

the same statutes (Counts Two and Four).  (Id. at 8–12.)  On September 13, 2022, Defendant

9

filed an answer.  (Doc. No. 7.)  After a case management conference and the filing of a joint case management plan (Doc. No. 14), on December 13, 2022, the Court issued an Order scheduling a period of limited discovery to end January 13, 2023 (Doc. No. 15).  That same day, the Court referred the instant action to a mediator.  (Doc. No. 16.)  On February 22, 2023, the mediator filed a report informing the Court that the parties did not reach a settlement.  (Doc. No. 17.)

    The Court subsequently issued an Order setting the close of fact discovery on May 26, 2023.  (Doc. No. 19.)  The Court received and granted several motions to extend discovery in this matter.  (Doc. Nos. 20, 21, 22, 23, 24, 25.)  On August 17, 2023, the Court held a Post Discovery Status Conference with the parties.  (Doc. No. 26.)  The next day, the Court set the a deadline to file <u>Daubert</u> motions of September 8, 2023.[10]  (Doc. No. 27.)  On September 8, 2023, Defendant filed a motion to preclude the report and testimony of Mr. Sachs as expert opinion in the instant action, as well as a brief in support of that motion.  (Doc. Nos. 28, 29.)  On September 22, 2023, Plaintiff filed a response in opposition to Defendant's motion.  (Doc. No. 32.)  Subsequently, on October 13, 2023, the parties filed a Joint Stipulation of Facts wherein the parties agreed that Mr. Sachs could not offer expert opinions on certain topics, and that Defendant would accordingly withdraw its motion to preclude Mr. Sachs' expert testimony.  (Doc. No. 33.)  On October 27, 2023, the Court approved (Doc. No. 34) the Joint Stipulation of Facts, deeming Defendant's motion (Doc. No. 28) to preclude Mr. Sachs' expert testimony withdrawn.

    On November 22, 2023, Defendant filed the instant motion for summary judgment.  (Doc. No. 35.)  Defendant also filed a Concise Statement of Material Facts (Doc. No. 36), as

---

[10] A <u>Daubert</u> motion permits parties to challenge the reliability of an expert opinion in accordance with the United States Supreme Court's holding in <u>Daubert v. Merrell Dow Pharmaceuticals., Inc.</u>, 509 U.S. 579 (1993).

well as dozens of exhibits relevant to its motion for summary judgment (Doc. Nos. 37-1 through 37-37).  On December 6, 2023, Defendant filed a brief in support of its motion for summary judgment.  (Doc. No. 40.)  On December 27, 2023, the Pennsylvania Human Relations Commission ("PHRC") moved to participate as an Amicus Curiae in the instant action.  (Doc. No. 45.)  That same day, the PHRC filed a brief in support of its motion (Doc. No. 46), and Plaintiff filed her brief in opposition to Defendant's Motion for Summary Judgment (Doc. No. 47), as well as her Responsive Statement of Material Facts (Doc. No. 48).  On January 2, 2024, the parties filed a Joint Motion to Replace Unredacted Files with Redacted Versions.  (Doc. No. 51.)  The Court subsequently granted that motion, instructing the Clerk of Court to strike twenty-three (23) exhibits from the docket of this matter, while permitting the parties to file new versions with personal data identifiers redacted.  (Doc. No. 52.)  On January 10, 2024, Defendant filed its reply brief in further support of its motion for summary judgment.  (Doc. No. 53.)

On January 17, 2024, Plaintiff filed a motion for leave to file a sur reply (Doc. No. 54), as well as a brief in support of that motion (Doc. No. 55).  On January 18, 2024, Plaintiff filed an unopposed motion requesting oral argument as to Defendant's summary judgment motion.  (Doc. No. 57.)  On January 30, 2024, Defendant filed a brief opposing in part Plaintiff's motion for leave to file a sur reply, arguing that the Court should permit only one subsection of Plaintiff's sur reply to be filed.  (Doc. No. 58.)  On April 12, 2024, the Court granted Plaintiff's motion for leave to file a sur reply, and granted the Pennsylvania Human Relations Commission's motion for leave to participate as an Amicus Curiae on behalf of Plaintiff.  (Doc. No. 59.)  Accordingly, Defendant's motion is fully briefed and ripe for disposition.

II.      **LEGAL STANDARD**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251-52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the

12

non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S.

at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and

more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not

defeat a motion for summary judgment with evidence that would not be admissible at trial.  See

Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.   DISCUSSION

Defendant's motion seeks the entry of summary judgment on Plaintiff's ADEA and

PHRA discrimination claims and her ADEA and PHRA retaliation claims.  The Court first

examines Defendant's entitlement to summary judgment as to Plaintiff's ADEA and PHRA

discrimination claims.  In so doing, the Court initially evaluates Plaintiff and Amicus Curiae

Pennsylvania Human Relations Commission ("Amicus")'s argument that the Court should place

a heightened burden on Defendant as it pertains solely to Plaintiff's PHRA discrimination claim.

After determining the applicable standard of review, the Court assesses the merits of Defendant's

argument that it is entitled to summary judgment on Plaintiff's ADEA and PHRA discrimination

claims.  Finally, the Court evaluates Defendant's entitlement to summary judgment as to

Plaintiff's ADEA and PHRA retaliation claims.

### A.   Plaintiff's ADEA and PHRA Discrimination Claims

#### 1.   Whether Different Standards of Review Apply to Plaintiff's ADEA and PHRA Discrimination Claims

Defendant maintains that, in evaluating its motion for summary judgment as to both

Plaintiff's ADEA and PHRA discrimination claims, the Court should apply the typical burden

shifting framework as enunciated by the United States Supreme Court in McDonnell-Douglas

Corporation v. Green.  (Doc. No. 40 at 15.)   Citing Willis v. UPMC Children's Hospital of

13

<u>Pittsburgh</u>, Defendant argues that the PHRA and ADEA have been interpreted "the same" and it follows that "the same analysis is used for both statutes." (<u>Id.</u> (citing <u>Willis v. UPMC Children's Hosp. of Pittsburgh</u>, 808 F.3d 638, 643 (3d Cir. 2015))).

In response, both Plaintiff and Amicus argue that the Court should place a greater burden on Defendant at the summary judgment stage in ruling on Defendant's summary judgment motion as to Plaintiff's PHRA discrimination claim. (Doc. Nos. 46; 47 at 16–22.) Amicus argues that there are two types of employment discrimination cases: (1) pretext theory cases as analyzed by the <u>McDonnell-Douglas</u> framework; and (2) "mixed motive" cases, in which a plaintiff argues that an adverse employment decision was motivated by <u>both</u> legitimate and discriminatory reasons. (Doc. No. 46 at 7–8.) Amicus maintains that the Court effectively has two options for addressing age discrimination claims under the PHRA. (<u>Id.</u> at 9.) First, Amicus argues that the Court could apply the framework set up by the Supreme Court in <u>Gross v. FLB Financial Services Incorporated</u>, which requires a Plaintiff to prove, "by a preponderance of the evidence, that age was the 'but for' cause of the challenged employment action." <u>See</u> (<u>id.</u> (citing <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 178 (2009))). On the other hand, Amicus asserts that the "1991 CRA [Civil Rights Act] framework" could and should apply in this case. (Doc. No. 46 at 9–10.) Under the 1991 CRA framework, Amicus contends that a plaintiff who demonstrates that "an illegitimate factor played a motivating part in an adverse employment action, the fact that legitimate factors may also have led to the employment decision does not relieve the employer of liability for employment discrimination." (<u>Id.</u> at 15.)[11]

---

[11] Plaintiff and Amicus ask the Court to apply the mixed motive framework, in which Plaintiff must present "sufficient evidence to enable a reasonable jury to conclude that [discrimination] was either a motivating or determinative factor behind [the employer's] adverse personnel decisions." <u>See</u> <u>Garner v. Pennsylvania Hum. Rels. Comm'n</u>, 16 A.3d 1189, 1201 (Pa. Commw. Ct. 2011) (citing <u>Prise v. Alderwoods Grp., Inc.</u>, 657 F. Supp. 2d 564, 588 (W.D. Pa. 2009)).

Plaintiff argues that courts have interpreted the "best able and most competent" language of the PHRA to place a higher burden on an employer, because the PHRA provides greater protection to aggrieved employees than its federal counterpart.  (Doc. No. 47 at 17–18.) Plaintiff's argument is essentially that: (1) the Court is not required to apply the traditional McDonnell-Douglas burden shifting framework in evaluating Defendant's summary judgment motion as to Plaintiff's PHRA discrimination claim; (2) the Court should recognize that in PHRA claims involving other protected classes, such as racial minorities, state courts have applied the "mixed motive" theory requiring plaintiffs to demonstrate that discrimination was a motivating factor in the adverse employment action; (3) the PHRA is the only antidiscrimination statute operable in Pennsylvania and it would be perverse to assume that all claims do not receive the same treatment; and (4) the Court should therefore heed several state court decisions and apply this heightened standard, despite the fact that the Pennsylvania Supreme Court has never definitively ruled on this issue.  (Doc. No. 47 at 19–20.)

In evaluating the arguments of the parties on the question of the appropriate standard of review for Plaintiff's PHRA age discrimination claim, the Court is unpersuaded by Plaintiff and Amicus' arguments and therefore declines to deviate from the longstanding practice within this Circuit of evaluating ADEA and PHRA discrimination claims under the same standard of review and with the same burden shifting approach.

The Court first observes that nothing in the statutory text of the PHRA compels the Court to place a higher burden on the employer at the summary judgment stage.  The ADEA provides

---

Under this framework, if Plaintiff meets her burden, Defendant "can avoid liability by proving that it would have made the same decision, even if it had not taken into account the employee's protected class."  See Garner, 16 A.3d at 1201.

that an employer shall not "fail or refuse to hire or to discharge any individual or otherwise

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's age."  See 29 U.S.C. § 623(a)(1).  The

PHRA in turn provides that an employer cannot:

> because of the race, color, religious creed, ancestry, age, sex, national origin or non-
> job related handicap or disability or the use of a guide or support animal because of
> the blindness, deafness or physical handicap of any individual or independent
> contractor, to refuse to hire or employ or contract with, or to bar or to discharge
> from employment such individual or independent contractor, or to otherwise
> discriminate against such individual or independent contractor with respect to
> compensation, hire, tenure, terms, conditions or privileges of employment or
> contract, if the individual or independent contractor is the best able and most
> competent to perform the services required.

See 43 Pa. C.S.A. § 955(a).  As a general matter, the United States Court of Appeals for the

Third Circuit (the "Third Circuit") has held that "the interpretation of the PHRA is identical to

that of federal anti-discrimination laws, including the ADEA," see Willis, 808 F.3d at 643, and it

follows that courts should analyze claims under both statutes through the same lens unless "there

is something specifically different in [the PHRA's] language requiring that it be treated

different" see Fogleman, 283 F.3d at 567.  Importantly, in Willis, the Third Circuit cited the

operable provisions and noted that "[t]he relevant provisions of the ADEA and the PHRA do not

provide any indication" that the differing language exception applies.  See Willis, 808 F.3d at

643 n.4.  The Court finds that the Third Circuit's conclusion—that the anti-discrimination

provisions of the ADEA and PHRA are analogous and should be applied identically—to be

persuasive in this case.

    While Amicus maintains that this Court should "liberally construe the PHRA's

provisions for the accomplishment of [the statute's] purposes," (Doc. No. 46 at 13), neither

Plaintiff nor Amicus cite authority from the Supreme Court of Pennsylvania holding that the

"best able and most competent" language puts the PHRA on a higher plane than the ADEA. To

the contrary, the Supreme Court of Pennsylvania stated that:

> the 'best able and most competent' language of our Human Relations Act has been
> the source of considerable confusion. According to one view, this language
> operates primarily in 'disparate impact' cases to establish a correlative of the
> 'business necessity defense' found in Title VII cases. Its effect in 'disparate
> treatment' cases, such as the present, is limited to allocating the burdens of proof
> in the same way as described in <u>McDonnell Douglas</u>, <u>Burdine</u>, and <u>Aikens</u>.
> Another view treats the language as creating an element of <u>any</u> cause of action
> under the section, whether under the disparate impact or disparate treatment theory,
> and would assign the burden of proof as to that element to the plaintiff. Here, the
> parties and the lower tribunals proceeded as though the 'best able and most
> competent' language had no effect on the <u>McDonnell Douglas</u> elements of either
> the employee's prima facie case or the employer's defense; the defendant has never
> contended that the plaintiff bore the burden of proving that she was 'best able and
> most competent.'

<u>See</u> <u>Allegheny Hous. Rehab. Corp. v. Com., Pennsylvania Hum. Rels. Comm'n</u>, 532 A.2d 315,

317 n.2 (Pa. 1987) (citations omitted) ("<u>Allegheny Housing</u>"). While not necessarily clarifying,

<u>Allegheny Housing</u>'s declaration that the "best and most competent" language from the PHRA

has caused "considerable confusion," <u>see</u> <u>id.</u>, is nonetheless helpful in undertaking an analysis of

the statutory language. The opinion noted that many parties and lower courts have proceeded as

though the phrase did not affect <u>McDonnell-Douglas</u> burden shifting. <u>See</u> <u>id.</u> Because no more

recent opinions from the Supreme Court of Pennsylvania have clarified the meaning or operation

of the "best and most competent" language, the Court is unpersuaded by Plaintiff and Amicus'

argument on this point.[12] For the foregoing reasons, the Court concludes that Plaintiff's ADEA

and PHRA discrimination claims should be assessed under the same analytical framework.

---

[12] To the contrary, Pennsylvania courts evaluating age discrimination claims pursuant to the
PHRA continue to utilize the traditional <u>McDonnell-Douglas</u> burden shifting framework. <u>See</u>
<u>Riemer v. II-VI, Inc.</u>, No. 338 WDA 2023, 2024 WL 749932, at *3 (Pa. Super. Ct. Feb. 23,
2024) (noting that "Pennsylvania has adopted the same [McDonnell-Douglas] framework for
indirect evidence of age discrimination under the PHRA"); <u>see also</u> <u>Rodrock v. Pub. Util.</u>
<u>Comm'n</u>, 307 A.3d 169, 2023 WL 6862059 at *5 (Pa. Commw. Ct. 2023) (applying <u>McDonnell-</u>

### 2.      Legal Standard Applicable to ADEA and PHRA Discrimination Claims

Under the ADEA, an employer is prohibited from discharging or otherwise discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  See 29 U.S.C. § 623(a)(1).  In order to prevail on an ADEA claim, a plaintiff must establish that age was the "but-for" cause of the adverse employment action at issue.  See Willis, 808 F.3d at 644 (citing Gross, 557 U.S. at 177–78).  A plaintiff can sustain a claim of discrimination under the ADEA by presenting either direct or circumstantial evidence of discrimination.  See Duffy v. Magic Paper Grp., Inc., 265 F.3d 163, 167 (3d Cir. 2001).  Where a plaintiff relies on circumstantial evidence, the Court reviews age discrimination claims pursuant to the three-part framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973).  See Willis, 808 F.3d at 644.  Under the McDonnell Douglas framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination.  See Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1997)).  When a plaintiff satisfies the elements of a prima facie case, that creates an "inference of unlawful discrimination."  See Willis, 808 F.3d at 644 (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir. 1999)).  The elements of a prima facie case of age discrimination are: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive.  See Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013).

---

Douglas in addressing a PHRA age discrimination claim).

Where the plaintiff is not directly replaced, the fourth element may be satisfied if the plaintiff can provide facts which "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." See Pivirotto, 191 F.3d at 352. Additionally, "[r]ecognizing that the fourth element is inadequate in a reduction in force context, as opposed to demotion or discharge cases," the United States Court of Appeals for the Third Circuit has also specified that the "fourth element [can be] satisfied by showing that the employer retained a 'sufficiently younger' employee." See Anderson v. Consol. Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002) (citing Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 235 (3d Cir. 1999)).

"Once the plaintiff has successfully established a prima facie case creating an inference of discrimination, the burden shifts to the employer who must 'articulate a legitimate, non-discriminatory reason for the adverse employment action.'" See Willis, 808 F.3d at 644 (quoting Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999)). At this stage, the employer is not required to prove that the articulated legitimate, non-discriminatory reason was the actual reason for the adverse employment action, but need only provide evidence that would allow a factfinder to determine that the decision was made for non-discriminatory reasons. See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). If the employer satisfies this prong, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered non-discriminatory reason was pretextual. See Burton, 707 F.3d at 726–27. In order to survive summary judgment when an employer has articulated a legitimate, nondiscriminatory reason for its employment action, a plaintiff must adduce some evidence that would allow a factfinder to reasonably either "(1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." See Simpson, 142 F.3d at 644 (citing Fuentes, 32 F.3d at 764).

To establish pretext based on disbelief, a plaintiff's evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to allow a factfinder to conclude that the employer's actions could not have been taken for non-discriminatory reasons. See Fuentes, 32 F.3d at 759.   In the alternative, to establish pretext based on the argument that a discriminatory reason was "more likely than not a motivating or determinative cause," a plaintiff must present evidence "with sufficient probative force" to allow a factfinder to "conclude by a preponderance of the evidence that age was a motivating or determinative factor." See Simpson, 142 F.3d at 644–45 (citing Keller, 130 F.3d at 1111).  Specifically, a plaintiff must point to evidence demonstrating that (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably.  See Simpson, 142 F.3d at 645 (citing Fuentes, 32 F.3d at 765).  "If this step is satisfied, at trial the plaintiff must convince the factfinder that not only was the employer's proffered reason false, but the real reason was impermissible discrimination."  Willis, 808 F.3d at 645 (citing Fuentes, 32 F3d at 763 (internal quotation omitted)).

### 3.   Plaintiff's ADEA and PHRA Discrimination Claims

#### a.   Arguments of the Parties

At the outset, the Court notes a discrepancy between the complaint and the parties briefing related to the pending summary judgment motion.  As noted supra, Plaintiff's complaint raises four claims: (1) ADEA discrimination based on Defendant's termination of Plaintiff; (2) ADEA retaliation based on Defendant's failure to rehire Plaintiff following the filing of her EEOC charge; (3) PHRA discrimination; and (4) PHRA retaliation.  (Doc. No. 1.)  That said, in

its motion for summary judgment, Defendant discusses Plaintiff's discrimination claim as if it is

comprised of two claims: (1) Defendant's unlawful firing; and (2) Defendant's failure to rehire

Plaintiff.  (Doc. No. 40 at 24–31.)  In her responsive brief, Plaintiff argues that the Court should

not grant summary judgment as to her discrimination claim based on Defendant's failure to

rehire her.  (Doc. No. 47 at 33–42.)  The Court observes that Plaintiff did not raise a failure to

rehire discrimination claim in her complaint.  Accordingly, the parties' arguments as to that

claim, namely the relevant pretext inquiry discussed infra, will be addressed in connection with

Plaintiff's retaliation claim, which is the only ADEA claim based on Defendant's failure to

rehire her for a position.[13]

For the purposes of its motion, Defendant concedes that Plaintiff can establish a prima

facie case of discrimination under the ADEA.  (Doc. No. 40 at 15.)  Defendant states that the

COVID-19 pandemic and the need to cut expenses due to the shuttering of the global economy is

the legitimate non-discriminatory reason supporting its decision to lay off Plaintiff.  (Id. at 16–

17.)  Defendant maintains that Plaintiff is unable to prove that its stated rationale was pretext for

unlawful discrimination.  (Id. at 17.)  Defendant cites cases supporting the proposition that

employees who are let go as part of workplace reorganization or a reduction in force carry a

heavier burden in making claims of discrimination.  (Id. at 18 (citing Hook v. Ernst & Young, 28

F.3d 366, 375 (3d Cir. 1994)).)  Defendant further alleges that Plaintiff "was not the oldest

person in the Marketing Department on April 3, 2020 when [Defendant] notified her of the

layoff."  (Doc. No. 40 at 18.)  Defendant argues that, even if Plaintiff was the most senior

---

[13]  The Court's interpretation of the briefing aligns with Plaintiff's EEOC complaints, in which
she originally filed a discrimination charge and discussed her layoff, (Doc. No. 51-18 at 6–7),
and the failure to rehire her is not addressed until she filed an amended charge to include her
allegations of retaliation (id. at 9–10).

member of the Marketing Department at the time of her termination, this fact is insufficient

evidence to support a finding of pretext, because Defendant did not use seniority in selecting

whom to lay off.  (Id. at 19.)  Defendant maintains that this Court should not examine its

business decisions, asserting that Plaintiff's argument that Defendant's decision to post available

jobs beginning in summer of 2020 is proof that layoffs were never necessary is without merit and

not for this Court to evaluate.  (Id.)

Next, Defendant argues that its decision to post a Content and Asset Coordinator position

on July 28, 2020 does not provide sufficient grounds for a reasonable factfinder to conclude that

its stated non-discriminatory reason for laying Plaintiff off was pretextual.  (Id. at 21.)

Defendant asserts that: (1) the Content and Asset Coordinator position differed from Plaintiff's

former job as a Content Coordinator; (2) assuming the jobs were the same, the fact that it posted

this position four months after firing Plaintiff reflects a business decision and not age

discrimination; and (3) even if Defendant erred in laying Plaintiff off in the first place, this does

not mean that Defendant must have been discriminating against Plaintiff in so doing.  (Id.)

In addition to the above arguments, Defendant also promulgates a statistical argument.

First, Defendant notes that Plaintiff was laid off at the same time as two other employees, neither

of whom was a member of the relevant protected class.  (Id. at 22.)  Second, Defendant argues

that, of the employees who remained in the Marketing Department after layoffs, three "were

either the same age as [Plaintiff] or older."  (Id.)  Further, Defendant asserts that, after the Phase

One (1) layoff, the average age in the Marketing Department increased.  (Id. at 23.)

In response, Plaintiff proffers several arguments in attempting to cast Defendant's stated

rationale for Plaintiff's firing as pretext for unlawful age discrimination.  Plaintiff first asserts

that Mr. White's statement that layoffs would target those who "would have the least immediate

financial impact on the business" was inaccurate and thus evidence that Defendant's stated rationale for laying Plaintiff off was mere pretext for age discrimination. (Doc. No. 47 at 28.) Plaintiff maintains that Mr. White changed his mind about whom to layoff, altering his selection criteria in the face of a question from Ms. Stoviak, in which she appeared to want the list to include more male employees. (Id.) Following Ms. Stoviak's query, Mr. White chose to layoff Mr. Lehman, a forty-seven (47) year old man, who was significantly older than the two employees Mr. White removed from the original layoff list. (Id.) Plaintiff maintains that Mr. White's "ability to quickly pivot on his layoff selections is sufficient evidence to show pretext." (Id.)

As to her second argument in support of pretext, Plaintiff maintains that Mr. White's testimony, in which he claims to have consulted with Ms. Bonafede about the impact of laying Plaintiff off, is contradicted by Ms. Bonafede's own testimony. (Id. at 29.) Plaintiff argues that this contradiction suggests pretext on the part of Defendant. See (id.). Plaintiff further notes that "[a]dditional evidence of pretext is [that Defendant] tried to rehire [Mr.] Vang, age 28, in May 2020." (Id. at 30.)

Plaintiff maintains that Defendant's discriminatory motive is evidenced by the fact that: (1) Defendant ignored Ms. Stoviak's proposal to potentially rehire Plaintiff; and (2) Defendant later hired a significantly younger person to take on some of Plaintiff's duties. (Id. at 31; Doc No. 49-28.) Plaintiff asserts that statistical evidence in disparate treatment cases "should be approached with caution and skepticism." (Doc. No. 47 at 31 (citing Healy v. New York Life Ins. Co., 860 F.2d 1209, 1217–18 (3d Cir. 1988)).) Plaintiff attempts to refute Defendant's other arguments, asserting that evidence of new hires after layoffs necessarily refutes the statistical evidence cited by Defendant. (Doc. No. 47 at 32.)

23

**b.    Whether the Court will Grant Summary Judgment as to Plaintiff's ADEA and PHRA Discrimination Claims**

As an initial matter, because Defendant concedes for purposes of the pending summary judgment motion that Plaintiff can demonstrate a prima facie case of discrimination pursuant to the ADEA and PHRA, the Court will confine its analysis to the pretext inquiry.  The Court follows the burden shifting framework enunciated by <u>McDonnell-Douglas</u>, providing that "[o]nce the plaintiff has successfully established a prima facie case creating an inference of discrimination, the burden shifts to the employer who must 'articulate a legitimate nondiscriminatory reason for the adverse employment action.'"  <u>See</u> <u>Willis</u>, 808 F.3d at 644 (citing <u>Jones</u>, 198 F.3d at 412).  Defendant does so here, asserting that, as a business specializing in travel related products, the need to lay off staff at the onset of the pandemic is a legitimate and non-discriminatory reason justifying its removal of Plaintiff from her position.  (Doc. No. 40 at 16.)

Accordingly, because Defendant has offered a non-discriminatory reason for Plaintiff's firing, the burden then shifts to Plaintiff "to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual."  <u>See</u> <u>Willis</u>, 808 F.3d at 644.  Plaintiff can do this in one of two ways.  First, Plaintiff can "point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action."  <u>See</u> <u>id.</u>  To do so, Plaintiff must cite record evidence revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons to satisfy the factfinder that the employer's actions could not have been [taken] for nondiscriminatory reasons."  <u>See</u> <u>id.</u> at 644–45.  In the alternative, Plaintiff can demonstrate that Defendant's stated rationale is pretextual by:

> [p]oint[ing] to evidence that would allow a factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Specifically, the plaintiff can show pretext this way by presenting evidence with sufficient probative force so as to allow the factfinder to conclude by a preponderance of the evidence that age was a motivating or determinative factor. Pointing to evidence demonstrating any of the following satisfies this second way to prove pretext: (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably.

See id. at 645 (cleaned up).

In attempting to meet that burden, Plaintiff points to several pieces of evidence she maintains are sufficient for a factfinder to reasonably either disbelieve Defendant's articulated reason for her termination, or believe that a discriminatory reason was more likely than not a motivating or determinative cause of Defendant's action. The Court examines each in turn.

First, Plaintiff asserts that the fact that Mr. White "rapidly switched his layoff selections," supports an inference that his reasoning for Plaintiff's layoff is pretextual. (Doc. No. 47 at 28.) Plaintiff cites evidence that Ms. Stoviak emailed Mr. White after Mr. White made his initial layoff recommendations, prompting him to consider "replacing one or more females with a 'male equivalent,'" and the fact that Mr. White ultimately altered said recommendations. (Id.) The Court finds that Mr. White's choice to alter his recommendations as to who should be laid off does not cast sufficient doubt on Defendant's offered legitimate non-discriminatory reason for Plaintiff's layoff. No reasonable factfinder, in drawing all inferences in favor of the non-moving Plaintiff, could conclude that Mr. White's process for determining who to lay off renders Defendant's pandemic-based rationale for dismissing several employees mere pretext for unlawful age discrimination.

In her next attempt to cast Defendant's stated reasoning for firing her as pretext, Plaintiff cites Mr. White's decision to retain "significantly younger and higher paid staff" and claims that

this decision renders Defendant's offered rationale implausible.  (Doc. No. 47 at 29.)  It follows, according to Plaintiff, that retaining younger staff with higher salaries makes any citation to the "financial impact" on Defendant significantly "less likely to be real criteria" used in making lay off decisions, indicating that this rationale is pretextual.  See (id. at 29–30).  The Court finds this proffered evidence unavailing for several reasons.  First, in evaluating Defendant's motion for summary judgment, the Court is mindful that the Third Circuit has instructed that "federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination."  See Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (citing Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996)).  It is not for this Court to decide whether Defendant's decision to retain some higher paid and younger employees was "the best, or even a sound, business decision," see Keller, 130 F.3d at 1109; rather, the Court is tasked with viewing all record evidence in the light most favorable to Plaintiff, the non-moving party, and determining whether a reasonable finder of fact could conclude that Defendant's choice to retain some higher paid employees renders its citation of pandemic-related financial concerns mere pretext for unlawful discrimination.  Because the Court does "not sit as a super-personnel department that reexamines an entity's business decisions," see Smith v. Thomas Jefferson Univ., No. 05-cv-02834, 2006 WL 1887984, at *5 (E.D. Pa. June 29, 2006), the Court declines to make such a finding here.  To the contrary, Plaintiff engages in speculation about the motives behind Defendant's decision-making pertaining to who would be retained during the pandemic.  Speculation without supporting record evidence cannot defeat a motion for summary judgment.  See Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) (holding that "speculation and conjecture" are insufficient to defeat a motion for summary judgment).

Relevant here, Defendant cites Mr. White's testimony that he "considered critical business functions and roles that would have the least immediate financial impact on the business while maintaining sales-supporting outputs for new products, merchandising, and retail circulars in deciding who to lay off in the Marketing Department, while meeting the target of a 25% reduction in overall payroll." (Doc. No. 53 at 13.)  The Court's task at summary judgment is to determine whether a reasonable finder of fact could conclude that Defendant's decision to retain younger and higher paid employees, while firing Plaintiff, renders its stated rationale—pandemic related financial concerns—pretext for unlawful discrimination.  Further, the Third Circuit places the burden on Plaintiff, in attempting to demonstrate that Defendant's proffered reason is mere pretext, "to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision."  See Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).  Plaintiff offers disagreement with Defendant's decision as to whom to lay off during the pandemic while failing to cite evidence "contradicting the core facts" see id., Defendant put forward.  Defendant maintains that it had to lay off staff in response to financial uncertainty during the pandemic and considered several factors in how to manage payroll obligations while still successfully operating their business.  To that end, the Court finds that the fact that some higher paid and younger employees were retained does not, without something more in the record, permit a reasonable factfinder to infer that Defendant's stated rationale contains "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" see Willis, 808 F.3d at 644, such that no reasonable factfinder could believe that the stated reason motivated the adverse employment action.  And as a general matter, the Court "will not second-guess a business entity's managerial determination that a reduction-in-force was an economic reality."

See Kenney v. Footlocker Worldwide, 55 F. App'x 35, 37 (3d Cir. 2002) (unpublished).[14]  Even if the Court was inclined to examine the demographics of Defendant's firing decisions, it is clear from the record that the Phase I coronavirus layoffs did not target older employees, because the average age of Marketing Department employees increased once the layoffs were implemented. See (Doc. No. 36 ¶ 18; Doc. No 48 ¶ 18); see also Houser v. Carpenter Tech. Corp., 216 F. App'x 263, 266 (3d Cir. 2007) (unpublished) (affirming a grant of summary judgment when the employee's pretext arguments "only questioned the methodology" of how firing decisions were made but failed to show that "as a whole, the reduction in force focused on older employees more than younger employees").[15]  Accordingly, the Court finds Plaintiff's challenge to Mr. White's testimony unavailing.

Plaintiff's next attempt to demonstrate that Defendant's stated rationale for her firing was pretextual cites the fact that Defendant tried to rehire Mr. Vang, who had been laid off as part of pandemic related personnel cuts.  (Doc. No. 47 at 30.)  Plaintiff asserts that Mr. Vang, who was twenty-eight (28) years old at the time Defendant explored rehiring him in May of 2020, was a

---

[14]  The Third Circuit has acknowledged that its unpublished opinions may nonetheless contain persuasive reasoning.  See Fuld, 604 F.3d at 823 (noting that an unpublished opinion is "as persuasive as its reasoning"); see also Drinker, 78 F.3d at 864 n.12 (following an unpublished opinion based on "factual similarity" and "look[ing] to the [unpublished opinion] as a paradigm of the legal analysis").  In Kenney, a panel of the United States Court of Appeals for the Third Circuit clearly delineated that courts should not second guess business decisions, particularly in the reduction in force context.  See Kenney, 55 F. App'x at 37.  Further, the panel held that "we agree with the District Court that the appellants failed to demonstrate that age was more likely than not a motivating or determining cause of their terminations, in part because the vast majority of the persons affected by the corporate reduction-in-force were under forty years of age."  See id.

[15]  The Third Circuit has acknowledged that its unpublished opinions may nonetheless contain persuasive reasoning.  See Fuld, 604 F.3d at 823 (noting that an unpublished opinion is "as persuasive as its reasoning"); see also Drinker, 78 F.3d at 864 n.12 (following an unpublished opinion based on "factual similarity" and "look[ing] to the [unpublished opinion] as a paradigm of the legal analysis").

younger employee whom Defendant wanted to re-employ in lieu of Plaintiff.  See (id.).  This fact

fails to cast doubt on Defendant's stated rationale for firing Plaintiff.  To the contrary, the fact

that Defendant considered rehiring Mr. Vang has no bearing on the pretext inquiry.  Plaintiff,

without citing any record evidence, asks the Court to infer that, because Defendant attempted to

hire back one of the previously laid off workers who was younger than Plaintiff, it necessarily

follows that there is a genuine dispute of material fact as to whether Defendant fired Plaintiff as a

result of pandemic related layoffs, or simply used the pandemic as an excuse to engage in age

discrimination.  Because Plaintiff fails to cite to record evidence in asking the Court to make this

inference, the Court is unpersuaded by Plaintiff's speculative argument on this point.  See

Fireman's Ins. Co. of Newark, N. J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (holding that

a party trying to defeat summary judgment cannot "rely merely upon bare assertions, conclusory

allegations or suspicions"); see also McKnight v. Sch. Dist. of Philadelphia, 171 F. Supp. 2d 446,

448 (E.D. Pa. 2001) (stating that "[u]nsubstantiated and subjective beliefs and opinions are not

competent summary judgment evidence") (quotation omitted).

　　　　Plaintiff also supports her pretext argument by pointing to Defendant's posting of the

Content and Asset Coordinator position, a position she contends is analogous to the one from

which she was removed, as well as Defendant's subsequent decision not to interview or hire her

for said position.  (Doc. No. 47 at 30.)  Plaintiff's contention fails to cast doubt on Defendant's

stated non-discriminatory reason for her removal.  Viewing the evidence of record in the light

most favorable to Plaintiff, the Court cannot find that, even if the later-posted Content and Asset

Coordinator position "was the same as [Plaintiff]'s prior Content Coordinator position" (id.), the

posting of this position permits a reasonable factfinder to conclude that Defendant's cited

rationale for Plaintiff's firing was merely pretext for unlawful age discrimination.

Plaintiff essentially asks the Court, without any citation to record evidence, to infer that Defendant's posting of a position similar to the one from which Plaintiff was removed several months after her firing means that Plaintiff was fired not as part of legitimate and non-discriminatory pandemic related layoffs, but instead as pretext for age discrimination. Such speculation is insufficient to defeat summary judgment. See Acumed LLC, 561 F.3d at 228. The Third Circuit has held that "summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." See Berckeley Inv. Grp., Ltd., 455 F.3d at 201. Additionally, while "proof of pretext does not have to include evidence of discrimination," record evidence suggesting that Defendant's stated rationale is false permits a reasonable factor to "infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." See Kautz, 412 F.3d at 467 (citing Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000)). Plaintiff fails to cite record evidence from which a reasonable factfinder could draw the inference that Defendant's stated reason for her removal is merely pretext for unlawful discrimination. Instead, Plaintiff simply restates the timeline of events, discussing how her eventual replacement's relative youth, combined with Defendant's decision not to rehire her, establishes an inference that Defendant's reasoning is pretextual. (Doc. No. 47 at 30–31.) These bare contentions simply do not permit a reasonable finder of fact, even viewing the evidence in the light most favorable to Plaintiff, to infer pretext on the part of Defendant in choosing to lay off Plaintiff.[16] See Healy v. New York Life Ins. Co., 860 F.2d 1209 (3d Cir. 1988) (explaining that the Court's inquiry

---

[16] Plaintiff cites her response (Doc. No. 47 at 30–31) to Defendant's Concise Statement of Material Facts (Doc. No. 36) in discussing the timeline of events that she finds pertinent to the Court's pretext inquiry.

"must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee"). Accordingly, the Court is unpersuaded that Defendant's posting of said position and failure to consider Plaintiff's application renders its stated pandemic-based rationale for her firing mere pretext for age discrimination.

Plaintiff's fifth and final attempt to demonstrate that Defendant's stated rationale for firing her is pretextual points to evidence of actions taken by Defendant in the months after she was laid off. (Doc. No. 56 at 18.) Plaintiff asserts that Defendant's hiring of Ms. Torres and Mr. DeBord, both of whom were younger than Plaintiff, demonstrates Defendant's true motive of discriminatory animus based on age. (Id. at 18–19.) Plaintiff maintains that Mr. White and Ms. Bonafede worked in concert to remove Plaintiff from her position and replace her with younger workers. (Id. at 20–21.) Viewing the record as a whole and construing all facts in the light most favorable to Plaintiff, the Court finds no factual basis for Plaintiff's desired inference that Defendant's post layoff actions, over a fifteen month period, could lead a reasonable factfinder to infer that, when Defendant initiated layoffs during the pandemic and removed Plaintiff from her position, Defendant's cited rationale for the layoffs was mere pretext for unlawful discrimination based on age. See Kenney, 55 F. App'x at 37 (stating that courts "will not second-guess a business entity's managerial determination that a reduction-in-force was an economic reality").

Ultimately, the Court is unpersuaded that, viewing all evidence of record in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Defendant's stated rationale for Plaintiff's termination was pretext for age discrimination. Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's ADEA and PHRA discrimination claims. The Court next evaluates whether Defendant is entitled to summary judgment as to Plaintiff's retaliation claims.

31

### B.    Plaintiff's ADEA and PHRA Retaliation Claims[17]

### 1.    Applicable Legal Standard

Plaintiff also asserts retaliation claims pursuant to the ADEA, 29 U.S.C. § 621 et seq.,

and the PHRA, 43 P.S. § 951 et seq.  As discussed supra regarding discrimination claims, the

Court similarly evaluates retaliation claims, in the absence of direct evidence of retaliation, under

the burden shifting framework enunciated by the United States Supreme Court in McDonnell

Douglas Corporation v. Green.  See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d

Cir. 2015) (citing McDonnell Douglas Corp, 411 U.S. at 802–05).[18]  To establish a prima facie

case of retaliation under the ADEA, a plaintiff must show:

> (1) protected employment activity; (2) adverse action by the employer either after
> or contemporaneous with the employee's protected activity; and (3) a causal
> connection between the employee's protected activity and the employer's adverse
> action.

See Daniels, 776 F.3d at 193.  Further,

> [i]f an employee establishes a prima facie case of retaliation under the [relevant
> statute], the burden shifts to the employer to advance a legitimate, non-retaliatory
> reason for its adverse employment action.  The employer's burden at this stage is
> relatively light: it is satisfied if the defendant articulates any legitimate reason for
> the [adverse employment action]; the defendant need not prove that the articulated
> reason actually motivated the [action].

See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500–01 (3d Cir. 1997) (citation omitted).  "If the

employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that 'the

employer's proffered explanation was false, and that retaliation was the real reason for the

---

[17]  The anti-retaliation provisions of the ADEA and PHRA are viewed analogously and thus the
same standard of review applies.  See Fasold v. Just., 409 F.3d 178, 183 (3d Cir. 2005).

[18]  Because the Americans with Disabilities Act, ADEA, and Title VII of the Civil Rights Act
contain "nearly identical" anti-retaliation provisions, the Third Circuit has found that "precedent
interpreting any one of these statutes is equally relevant to interpretation of the others."  See
Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002).

adverse employment action.'"  See Daniels, 776 F.3d at 193 (citation omitted).  The Third

Circuit further explained that, "[t]he plaintiff must prove that retaliatory animus played a role in

the employer's decisionmaking process and that it had a determinative effect on the outcome of

that process.  The burden of proof remains at all times with the plaintiff."  See Krouse, 126 F.3d

at 501 (cleaned up).  Finally,

> [t]o obtain summary judgment, the employer must show that the trier of fact could
> not conclude, as a matter of law, (1) that retaliatory animus played a role in the
> employer's decisionmaking process and (2) that it had a determinative effect on the
> outcome of that process. This may be accomplished by establishing the plaintiff's
> inability to raise a genuine [dispute] of material fact as to either: (1) one or
> more elements of the plaintiff's prima facie case or, (2) if the employer offers a
> legitimate non-retaliatory reason for the adverse employment action, whether the
> employer's proffered explanation was a pretext for retaliation.

See id.

With regard to establishing the first element of a prima facie retaliation claim—showing

that the plaintiff engaged in protected employment activity—the Third Circuit has held that the

filing of formal charges, in addition to "informal protests of discriminatory employment

practices, including making complaints to management," see Curay-Cramer v. Ursuline

Academy of Wilmington, Delaware, Inc., 450 F.3d 130, 135 (3d Cir. 2006), are protected

activities under the relevant statutes.  To determine if the plaintiff sufficiently opposed

discrimination, "we look to the message being conveyed rather than the means of conveyance."

See Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006).  "The complaint must

allege that the opposition was to discrimination based on a protected category, such as age or

race."  Daniels, 776 F. 3d at 193.  Additionally,

> although a plaintiff in a retaliation case need not prove the merits of the underlying
> discrimination complaint, [he] must have act[ed] under a good faith, reasonable
> belief that a violation existed.  This standard requires an objectively reasonable
> belief that the activity the plaintiff opposed constituted unlawful discrimination
> under the relevant statute.

See id. at 193–94 (cleaned up).  In other words, to establish a prima facie case, a plaintiff must present evidence that a reasonable person, standing in their shoes, would believe that they were standing in opposition to discrimination on the part of the defendant.  See Kengerski v. Harper, 6 F.4th 531, 537 (3d Cir. 2021).

As to the second element of a prima facie case—demonstrating adverse action by the employer during or after the protected activity—the Third Circuit specified that:

> the plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

See id. at 195.  Adverse actions include termination, see LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007), as well as lateral transfers to other positions, see Moore, 461 F.3d at 347–48.  However, "petty slights or minor annoyances that often take place at work" do not constitute adverse action under the ADEA.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  That said, "context matters such that an act that would be immaterial in some situations is material in others."  See Daniels, 776 F.3d at 196 (citing Burlington N. & Santa Fe Ry. Co, 548 U.S. at 68).

Finally, as to the third element of the prima facie retaliation claim—requiring a causal connection between the adverse employment action by the employer and the protected act by the employee—the Third Circuit has articulated several types of evidence that courts should consider when "determining whether a sufficient causal link exists to survive a motion for summary judgment."  See LeBoon, 503 F.3d at 232.  "Where the temporal proximity between the protected activity and the adverse action is unusually suggestive, it is sufficient standing alone to create an inference of causality and defeat summary judgment."  Id.  However,

> [w]here the temporal proximity is not unusually suggestive, we ask whether the
> proffered evidence, looked at as a whole, may suffice to raise the inference.  Among
> the kinds of evidence that a plaintiff can proffer are intervening antagonism or
> retaliatory animus, inconsistencies in the employer's articulated reasons for
> terminating the employee, or any other evidence in the record sufficient to support
> the inference of retaliatory animus.

See id. at 232–33 (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001)).

### 2.     Plaintiff's ADEA and PHRA Retaliation Claims

#### a.     Arguments of the Parties

Defendant asserts that Plaintiff cannot make a prima facie showing of retaliation.  (Doc.
No. 40 at 31–32.)  Relevant to the third element of a prima facie case—requiring Plaintiff to
demonstrate "a causal connection between the employee's protected activity and the employer's
adverse action" see Krouse, 126 F.3d at 500—Defendant observes that Plaintiff's attorney sent
Defendant a letter on September 28, 2020, notifying Defendant of Plaintiff's potential litigation
against it.  (Id. at 32.)  According to Defendant, it follows that the relevant time period for
establishing a prima facie case is September 28, 2020 to December 28, 2020, citing several cases
in this Circuit delineating that "a period of three months or more does not establish any causal
connection based on timing."  See (id. (citing LeBoon, 503 F.3d at 233; Hughes v. Allegheny
County Airport Auth., No. 15-cv-00221, 2017 WL 2880875 at *9 (W.D. Pa. July 6,
2017), aff'd, 728 F. App'x 140 (3d Cir. 2018))).  Defendant further argues that courts in this
Circuit have declined to infer retaliatory discrimination—even when the temporal proximity is
suspect—in instances where an employee is treated similarly both before and after engaging in
protected activities under the relevant statutes.  (Doc. No. 40 at 32–33.)  Defendant asserts that
Plaintiff applied for and was not hired for several jobs with Defendant both before and after
Plaintiff's counsel sent the letter informing Defendant about the prospect of litigation and
therefore an inference of retaliation is inappropriate.  (Id. at 33.)

Defendant next argues that, even if Plaintiff can establish a prima facie case of retaliation, Plaintiff cannot provide evidence showing that Defendant's stated non-retaliatory reasons for failing to rehire Plaintiff—her failure to meet the minimum qualifications for the positions, the incompatibility of her prior experience with later job postings, or her poor employment record—are pretext for unlawful discrimination.  (Id. at 34.)

Responding to Defendant's arguments, Plaintiff maintains that she can demonstrate a prima facie case of retaliation and provide evidence sufficiently establishing that Defendant's stated rationale for failing to rehire her was pretextual.  First, Plaintiff notes that she sent both a Notice of Preservation to Defendant and filed a charge with the EEOC.  (Doc. No. 47 at 43.) Plaintiff asserts that these are protected activities under the ADEA and thus satisfy her burden under the first element of a prima facie case.  As to the second element of a prima facie retaliation case—requiring adverse action by an employer—Plaintiff maintains that she applied for eighteen jobs with Defendant without being asked to interview or receiving any offer of employment.  (Id.)  Plaintiff cites 29 U.S.C. § 623(d) for the proposition that "[d]enying a qualified applicant, the opportunity to be considered for an open job is an adverse action."  (Id. (citing 29 U.S.C. § 623(d)).)[19]  Plaintiff then focuses her argument in support of the second

---

[19]  The language of 29 U.S.C. § 623(d) reads as follows:

> [i]t shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

See 29 U.S.C. § 623(d).

element of her retaliation claim on the jobs she applied for "that clearly align with the strongest aspects of her skillset." (Doc. No. 47 at 44.)

As to Defendant's Purchasing Coordinator position, a position for which Plaintiff submitted applications on October 7, 2020, October 29, 2020, and December 8, 2020, Plaintiff maintains that: (1) the position did not require more than a high school degree or equivalent; (2) the essential job duties were similar to her Content Coordinator duties; and (3) she worked with the Purchasing Department during her time with Defendant. (Id. at 44–45.) Plaintiff maintains that the Court should view the Purchasing Coordinator job description as analogous to the Content Coordinator position, and this fact, in addition to Ms. Stoviak's suggestion that Defendant should hire back employees who had been laid off, combine to establish an inference that the failure to give Plaintiff an interview was retaliatory. (Id.) Further, Plaintiff asserts that "there is evidence [Ms.] Stoviak responded to the news of [Plaintiff]'s application in a manner that could be interpreted not to address pay rate or skill set, but antagonism towards [Plaintiff.]" (Doc. No. 56 at 26.) Plaintiff cites an email sent by Mr. Stoviak to Ms. Elizabeth Hoover ("Ms. Hoover"), an HR Support worker with Defendant, in which Ms. Stoviak writes "[w]ow, do not pass to them" referring to sending the hiring managers Plaintiff's application to be Purchasing Coordinator. (Id. (citing Doc. No. 51-20 at 3).) Plaintiff also asserts that she was qualified for the Product Data Specialist position, for which she sent applications on November 11, 2020 and December 8, 2020. (Doc. No. 47 at 45.)

In her next attempt to demonstrate that Defendant retaliated against her by failing to consider her for a position for which she was qualified, Plaintiff cites the eCommerce Coordinator position and states that Defendant's failure to post this job opening publicly in September of 2020 rendered her unable to apply for it in the first place. (Doc. No. 47 at 46.)

Plaintiff argues that Mr. DeBord, who was eventually hired to fill the role following the re-posting of the position in the spring of 2021, lacked the requisite career experiences to qualify him for the position, even bearing in mind the fact that he has a college degree, which was a job requirement.  (Id.)  Plaintiff maintains that the work in this position was very similar to the work she undertook as Defendant's Content Coordinator.  (Id.)  It follows, according to Plaintiff, that "a jury could find that [Plaintiff] was qualified for the eCommerce position and [Defendant] retaliated against her when she applied for the job in March 2021."  (Id. at 47.)

Plaintiff next argues that she was qualified for and retaliated against following the April 26, 2021 submission of her application to serve in the Picker/Packer position.  (Id. at 44, 47.)  Plaintiff asserts that the mere fact that Defendant never called her to permit her to interview for this job would allow a "trier of fact to conclude [that Defendant] had decided to not hire her for any position because she filed a discrimination charge."  (Id. at 47.)  As it pertains to Plaintiff's application to Fox Chapel, Plaintiff maintains that Ms. Bonafede refused to give her an employment reference upon Ms. Vonada's request.  (Id.)

In trying to demonstrate the third element of a prima facie retaliation claim—which requires Plaintiff to demonstrate a causal connection between the employee's protected activity and the employer's adverse action, see Krouse, 126 F.3d at 500—Plaintiff cites Defendant's receipt of its Notice of Preservation Letter on October 1, 2020 and subsequent failure to send Plaintiff's application for the Purchasing Coordinator position to the hiring manager just seven days later, asserting that this timeline is suggestive of causation.  (Doc. No. 47 at 49.)  More broadly, Plaintiff maintains that Defendant's failure to adhere to its stated goal of rehiring laid off employees, combined with the similarities between the open positions and the position from

which she was fired, provides sufficient evidence from which a reasonable finder of fact could conclude that Defendant acted with retaliatory intent in refusing to rehire her.  See (id.).

In support of her argument that Defendant's stated rationale—Plaintiff lacked the qualifications for the positions for which she applied due to her attitude and poor teamworking skills, Plaintiff's dearth of eCommerce ability, and Defendant's post layoff discovery of alleged performance issues—is pretextual, Plaintiff points to several pieces of evidence.  First, Plaintiff maintains that Ms. Bonafede did not actually believe that Plaintiff was "toxic" because she never informed Plaintiff of her feelings until the commencement of this litigation.  (Id. at 37.)  Plaintiff argues that she has several positive evaluations to counter the purportedly negative evaluations cited by Defendant.  (Id. at 38.)  Additionally, Plaintiff asserts that Ms. Bonafede believed her work was of good quality, and that any purported performance deficiencies were not discovered by Ms. Bonafede until after Defendant removed the job posting for the Content and Asset Coordinator position, indicating that Ms. Bonafede and Defendant's stated reasons for not rehiring her are pretextual.  (Id. at 40–41.)  Finally, Plaintiff maintains that Defendant fails to offer a satisfactory or consistent reason for removing the listing for the Content and Asset Coordinator position in the summer of 2020, suggesting that Defendant and its employees face credibility issues on this question better suited for a jury to evaluate than for this Court to analyze at the summary judgment stage.  (Id. at 42.)

### b.     Whether Defendant is Entitled to Summary Judgment as to Plaintiff's ADEA and PHRA Retaliation Claims

As an initial matter, the Court need not examine whether Plaintiff can establish a prima facie case of retaliation pursuant to the ADEA and PHRA, because even assuming that she can, and viewing all of the evidence of record in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to produce sufficient evidence demonstrating that Defendant's stated non-

retaliatory rationale for failing to rehire her—her lack of the requisite qualifications, the mismatch between her prior experience and the posted job descriptions, and the positions' requirement of a minimum level of co-worker interaction for which Plaintiff was not equipped—was pretext for retaliatory animus.  To reiterate,

> [i]f an employee establishes a prima facie case of retaliation under the [relevant statutes], the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action.  The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action].

See Krouse, 126 F.3d at 500–01.  Should the employer satisfy its burden, the "plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  See id. at 501.  In attempting to meet that burden, Plaintiff points to several pieces of evidence that she maintains demonstrate that Defendant's explanation was false and that she would not have suffered adverse employment action but for her protected activity.  The Court examines each in turn.

Plaintiff first asserts that Defendant's stated rationale for failing to rehire her is pretextual because Ms. Bonafede, who cited Plaintiff's "toxicity" and "attitude" during her deposition, did not actually believe that she was toxic.  (Doc. No. 47 at 37.)  Plaintiff cites Ms. Bonafede's evaluation of her, in which that Ms. Bonafede found Plaintiff's workplace performance to be "fully satisfactory." (Id.)  Plaintiff further maintains that Ms. Bonafede never disciplined Plaintiff and argues that this necessarily implies that Ms. Bonafede must have thought Plaintiff's performance was sufficiently strong such that she did not need to be disciplined.  (Id. at 37–38.)  The Court finds that Plaintiff's contentions on this point amount to pure speculation.  Plaintiff's citation of an earlier evaluation includes evidence that Ms. Bonafede did in fact rate her performance as "fully satisfactory" as it pertains to work competencies.  (Doc. No. 49-1 at 2.)

However, in the same evaluation, Ms. Bonafede notes the "negative" reaction Plaintiff exhibited to customers in interacting with them, while highlighting that her teamwork "needs improvement" because her reactions to team members requesting help were negative and not indicative of someone who wants to assist others.  (Id. at 4, 6–7.)  In examining whether Defendant's stated rationale for choosing not to rehire Plaintiff is pretext for unlawful retaliation, "the record is examined for evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons."  See Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995).  To the contrary, Ms. Bonafede's earlier evaluation of Plaintiff directly supports one of Defendant's stated rationales for failing to rehire her, specifically that the positions for which she applied required a minimum level of co-worker interaction for which Plaintiff was not equipped.  Upon consideration of the foregoing, it appears that the record evidence is consistent with Defendant's stated legitimate non-retaliatory rationale. See Daniels, 776 F.3d at 193.  Accordingly, viewing the evidence of record in the light most favorable to Plaintiff, the Court cannot find that Plaintiff's speculation as to Ms. Bonafede's true feelings on her job performance is sufficient to permit a reasonable factfinder to conclude that retaliatory animus, and not a legitimate concern regarding Plaintiff's ability to work with others, motivated Defendant's decision not to rehire her or that retaliatory animus was the real reason for Defendant's decision.

As to the second piece of evidence Plaintiff maintains permits a reasonable factfinder to conclude that Defendant's reasoning for failing to rehire her was mere pretext for unlawful retaliation, Plaintiff maintains that Ms. Bonafede "knew [she] had the eCommerce skills required" for the Content and Asset Coordinator position.  (Doc. No. 47 at 39.)  Plaintiff argues that: (1) she objectively had the skills to perform the Content and Asset Coordinator position; (2)

41

Ms. Bonafede felt that that this was an entry level position, negating her purported concerns that Plaintiff could not perform the duties of the position; and (3) Ms. Bonafede erroneously thought that Mr. DeBord, whom she interviewed for the position, was qualified "except he didn't have any eCommerce experience." (Id.)  Defendant states that it did not elect to fill the position when they posted the opening, deciding to cancel the position without offering it to anyone.  (Doc. No. 53 at 16.)  Defendant claims that the decision to cancel the position was based on legitimate reasons, namely that it reconsidered its needs and found that they could be met "through a combination of assigning tasks to existing employees and then using a temporary staffing agency." (Id.)

As discussed supra, the Court does not sit as a super personnel department, examining business decisions and evaluating their propriety.  See Smith, 2006 WL 1887984, at *5. Defendant offered a legitimate and non-retaliatory reason for cancelling the Content and Asset Coordinator position, and Plaintiff simply fails to point to record evidence which permits a reasonable finder of fact to conclude that this choice reflected pretext for unlawful retaliation. See Daniels, 776 F.3d at 193.  Plaintiff cites Mr. DeBord's resume and claims that his lack of qualifications renders Ms. Bonafede's testimony—that Plaintiff lacked eCommerce experience— suspect, since Mr. DeBord was considered for the same position even without specific qualifications.  (Doc. No. 47 at 39.)   Plaintiff also cites the fact that, in his deposition, Mr. Sachs found Plaintiff to be overqualified for the position.  (Doc. Nos. 47 at 39; 48 at 38–39.)  Even accepting these assertions as true and viewing all record evidence in the light most favorable to Plaintiff, the Court finds that the evidence referenced by Plaintiff would not permit a reasonable finder of fact to conclude that Defendant's stated reasoning for eliminating the posting and choosing not to hire anyone to fill the position was pretext for unlawful retaliation.  Defendant

asserts that it eliminated the position because its staffing needs could be met "through a combination of assigning tasks to existing employees and then using a temporary staffing agency." (Doc. No. 53 at 16.)  Plaintiff fails to cite to "inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons" see Sempier, 45 F.3d at 731.  Accordingly, the Court finds that Plaintiff's proffered evidence on this point fails to support a reasonable finder of fact's conclusion that Defendant's stated rationale for failing to rehire Plaintiff was pretextual, nor that retaliation motivated its actions.

Plaintiff next points to the job qualifications of four positions for which she applied and was not hired, addressing her own qualifications for those positions, that she claims renders Defendant's stated rationale for its failure to rehire her—that Plaintiff did not meet the requisite qualifications, her prior experience did not match the job descriptions, and the positions required a minimum level of co-worker interaction for which Plaintiff was not equipped— pretext for unlawful retaliation.  (Doc. No. 47 at 44–47.)  The Court examines each position in turn.

First, Plaintiff asserts that she was qualified for the Purchasing Coordinator position, a position for which Plaintiff applied on October 7, 2020, October 29, 2020, and December 8, 2020.  (Id. at 44–45.)  Defendant maintains that the position required the coordinator to work in a "team-oriented environment," while Plaintiff had "demonstrated over many years an inability to work with others."  (Doc. No. 53 at 22.)  Defendant is correct when it asserts that Plaintiff "offers no evidence that this explanation was pretext for retaliation."  (Id. at 23.)[20]  It is not for the Court to decide whether Plaintiff can sufficiently demonstrate her qualifications such that

---

[20]  In her sur reply, Plaintiff argues that Defendant's assertion that she did not work well with others is an "issue of fact." (Doc. No. 56 at 24.)  Plaintiff also maintains that Ms. Stoviak cited pay range and skillsets in explaining why Plaintiff could not fill the position, thus rendering Defendant's invocation of her issue working on a team to be mere pretext for retaliation.  (Id. at 25.)

Defendant's stated reason for choosing not to rehire her was pretext for unlawful retaliation.  See Brewer, 72 F.3d at 332.  "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action."  Fuentes, 32 F.3d at 764 (emphasis added).  Here, viewing all record evidence in the light most favorable to Plaintiff, even if the Court credited Plaintiff's cited evidence that she was qualified for the position, the Court concludes that Plaintiff fails to cite to record evidence rendering Defendant's other stated reasons, namely her inability to work on a team, pretext for unlawful retaliation.

Next, Plaintiff asserts that she was qualified for the Product Data Specialist position, for which she applied on November 11, 2020 and December 8, 2020, because her previously held position with Defendant included data entry.  (Doc. No. 47 at 44–45.)  In response, Defendant claims that Plaintiff was unqualified for the position because it required her to work with "warehouse staff to identify problem items or packaging" and thus "her inability to work with others" rendered her unqualified.  (Doc. No. 53 at 23.)  The Court finds that Plaintiff fails to cite record evidence rendering Defendant's stated reasoning for not hiring Plaintiff for this position, namely her inability to work well with others, implausible or inconsistent such that a reasonable finder of fact could infer retaliation.  See Fuentes, 32 F.3d at 759.  Further, "[i]n evaluating the employer's reasons, our focus is upon whether the reasons honestly motivated the decision at issue, not whether the reasons are factually accurate."  See Oliver v. Clinical Pracs. of Univ. of Pennsylvania, 921 F. Supp. 2d 434, 449 (E.D. Pa. 2013).  Defendant has adduced sufficient evidence suggesting that several of its employees felt that Plaintiff struggled to work in a team setting.  See (Doc. Nos. 37-12 at 82–83 (deposition testimony of Mr. Sachs discussing Plaintiff's

"inability to interact productively with the team"); 37-18 (email from Mr. Lehman discussing Plaintiff's performance and noting that she "doe[s] not play well with others"); 37-20 (email from Ms. Bonafede discussing co-worker complaints about Plaintiff); 49-1 at 6–7 (Ms. Bonafede's evaluation of Plaintiff denoting her poor team skills)).  Accordingly, the Court is unpersuaded by Plaintiff's argument on this point.

In her next attempt to demonstrate that Defendant engaged in retaliation by not interviewing or hiring her for positions for which she was qualified, Plaintiff cites the eCommerce Coordinator position, a position for which she submitted an application on March 6, 2021, six (6) months after the filing of her EEOC and PHRC complaints, and claims that Mr. DeBord, who later filled this position, lacked the qualifications necessary for the position.  (Doc. No. 47 at 44, 46.)  Plaintiff further asserts that a reasonable jury could find that, when Defendant established a degree requirement for this position, said requirement was used "as a means to keep [Plaintiff] from applying and being hired for the position."  (Id. at 46.)  Defendant contends that Plaintiff's assertion that it added the degree requirement solely to preclude her from applying is baseless, while further noting that Plaintiff was not hired for this position because she did not possess a bachelor's degree in Business, Marketing, or Communications, as the job required. (Doc. No. 53 at 23.)  The Court finds Plaintiff's assertion that Defendant implemented a degree requirement for the eCommerce Coordinator position solely to preclude Plaintiff from applying, with no citation to record evidence in support, amounts to pure speculation that is insufficient to cast doubt on Defendant's stated reason as to demonstrate that "retaliation was the real reason for the adverse employment action.'"  See Daniels, 776 F.3d at 193; see also Fireman's Ins. Co. of Newark, N. J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (holding that a party trying to

defeat summary judgment cannot "rely merely upon bare assertions, conclusory allegations or suspicions").

Additionally, in her sur reply, Plaintiff asserts that Defendant's hiring of a temporary worker, Ms. Torres, to perform some of the duties previously performed by Plaintiff, was a sham to prevent Plaintiff from being hired back.  (Doc. No. 56 at 21.)  In support of this premise, Plaintiff cites a note from Ms. Stoviak to Mr. Abel and Ms. Bonafede, alleging that the note's skepticism about creating this position and hiring Ms. Torres to fill it reflects inconsistency on Defendant's part, because this decision amounted to creating a new position analogous to Plaintiff's prior held position while electing not to rehire Plaintiff.  (Id.)  However, Defendant correctly points out that Ms. Torres was hired to fill the Content and Asset Coordinator position twenty-one (21) months after Plaintiff was laid off.  (Doc. No. 53 at 17.)  Defendant posted the position from August 3, 2020 through August 11, 2020, several weeks before Plaintiff's counsel mailed Defendant a letter notifying it of Plaintiff's potential litigation or the filing of Plaintiff's EEOC and PHRC complaints.  (Doc. Nos. 36 ¶¶ 81–82; 53 at 15.)  As discussed supra, Defendant posted and then removed the posting for the Content and Asset Coordinator position in the summer of 2020, citing how it reconsidered its needs at that time and found that they could be met "through a combination of assigning tasks to existing employees and then using a temporary staffing agency."  (Doc. No. 53 at 16.)  Defendant offered a legitimate and non-retaliatory reason for cancelling the Content and Asset Coordinator position, and its decision almost two years later to reestablish the position and hire someone to fill it does not cast doubt on the legitimate non-retaliatory reason proffered by Defendant.  Because Plaintiff cites no record evidence of  "inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons" see Sempier, 45 F.3d at 731, the Court finds

Plaintiff's argument unavailing.  Additionally, because the cancelling of the position occurred before Plaintiff's protected activity, the Court finds that no reasonable factfinder could conclude retaliation on the part of Defendant, because Plaintiff failed to show that the "adverse action by the employer" occurred "either after or contemporaneous with the employee's protected activity."  See Krouse, 126 F.3d at 500.

Finally, Plaintiff attempts to demonstrate pretext by arguing that a "jury could just as well determine that [Ms.] Bonafede's lower rating of [Plaintiff]" in her evaluations "is pretext." (Doc. No. 56 at 23.)  Plaintiff also asserts that "[a] jury could question the veracity of the toxicity allegation."  (Id.)  It follows, according to Plaintiff, that she has sufficiently demonstrated a genuine dispute of material fact such that a reasonable factfinder could conclude that Defendant's stated reasons for not rehiring her—that Plaintiff did not meet the requisite qualifications, her prior experience did not match the job descriptions, and the positions required a minimum level of co-worker interaction for which Plaintiff was not equipped—were pretext for unlawful retaliation.  However, Defendant cites a series of evaluations, correspondence, and depositions in which its employees highlight serious concerns about Plaintiff's performance, largely with respect to her ability to work with others.  See supra at 44–45.  Plaintiff does not cite to any record evidence indicating that any of Defendant's decision makers did not honestly believe this negative feedback.  Accordingly, the Court finds that Plaintiff's pretext argument largely amounts to conjecture and speculation about Defendant's actual motivation, while failing to cite to record evidence reflecting "inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons."  See Sempier, 45 F.3d at 731.  Accordingly, the Court is unpersuaded that, viewing all evidence of record in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Defendant's stated rationale for choosing

not to rehire her was pretext for unlawful retaliation.[21]   Therefore, the Court will grant

Defendant's motion for summary judgment as to Plaintiff's ADEA and PHRA retaliation claims.

IV.   **CONCLUSION**

For all the foregoing reasons, the Court will grant Defendant's motion in its entirety.   An

appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[21]   Plaintiff also asserts that Defendant retaliated against her by denying her an employment
reference when she applied to work at Fox Chapel.  (Doc. No. 47 at 47.)  However, Defendant
asserts, and Plaintiff admits, that: Fox Chapel asked Plaintiff to provide a reference from a
former direct supervisor; Plaintiff named Ms. Bonafede; Ms. Bonafede then executed
Defendant's policy for referrals to verify dates of employment, wages, and title; Fox Chapel's
hiring managers did not negatively respond to Ms. Bonafede's referral; and after initially not
selecting Plaintiff, Fox Chapel later hired her.  (Doc. Nos. 36 ¶¶ 65–80; 48 ¶¶ 64–79.)